The next case this morning is 521-0320 People v. Nathaniel Harris arguing for the defendant appellant is Terry Green arguing for the state is Adam Rodriguez. Each side will have 10 minutes for their argument. The problem will also have five minutes for rebuttal. Please note only the clerk is permitted to record these proceedings. Morning. Morning. Good morning. Mr. Green, if you're prepared to begin, you may do so. Yes, thank you. May it please the court, counsel. My name is Terry Green. I'm an attorney in West Frankfort. I represent Nathaniel Harris, who Mr. Harris is from the Saline County area. He's now in prison in the Big Buddy Correctional Facility on the charge of aggravated criminal sexual assault of his own daughter. Uh, he was charged in this offense. The matter was originally set for a jury trial. His attorneys filed for a speedy trial. In this case, the case was set within the statute of limitations. Later, the because of the nature of the evidence, one of the witnesses was not until a few weeks at the time the jury trial was actually called for hearing. They went ahead. And at that point, the defendant waived his right to a trial, excuse me, jury trial. And the case was set for a bench trial. The case proceeded to trial. Witnesses were called. And at the conclusion of the case, the trial judge found the state had proved the elements of the offense beyond a and found him guilty, ultimately sentencing him to 15 years. Now, that subsequent to that time, then I was substituted as attorney at that point and filed a post trial motions and then which were denied and ultimately led to this appeal. Now, we we raised basically a couple of different issues in our appeal, one that the defendant, uh, uh, had been, uh, denied, uh, uh, effective assistance of counsel because of various actions that they had committed. I'll get into those. Uh, we'd also raised as an issue that the child was not competent to testify. It was his own child, a four year old child. We designated her old in the briefs, uh, to keep her name from being disclosed. In that instance, your honor, uh, the trial basically took over a period of four days. Uh, the, uh, first day of the proceedings, the, um, uh, child who was called as a witness by the attorney's office, there was a technical error that caused some difficulties and the court reporter did not take down some of the discussions they were trying to arrange for a, uh, a line where they could hear her in a separate room. So she would not be in the same room as her father, the defendant, because of that difficulty that wasn't taken down. The judge did describe on record that apparently the, uh, young child wouldn't have anything to do to him, wouldn't talk to her and that, uh, uh, she wouldn't answer his questions. We then proceeded, they then proceeded to the second day of trial. Witnesses, various witnesses, uh, were called. First witness was actually the defendant's wife, Kelsey. She had been with the child on the day that the, uh, report of abuse was actually made. The parties, my client and his, uh, former paramour, the mother of the child by the name of Blair Partain had been in a, uh, tumultuous relationship. Once she got pregnant, uh, the parties really didn't have much to do in common. And when the get visitation rights. Now the events that were, uh, in court over are basically what happened when she was, uh, four years of age. He, she was over on the weekend of May the 29th, 30th and 31st, uh, which, and went home on 6 p.m. on the 31st. She then came back the morning of, on the 3rd of June. By that time, my client was already at work. Let me stop you. We know that we're familiar with the facts of the case. If we get to the argument that, you know, your, your issues with, uh, the trial court. Thank you. That'd be great. Yes. Anyway, the point that we made as far as the competency, the child was described the first time she would not talk with the judge. Uh, later when the child was called, she would not, uh, answer the judge's questions. Uh, and that proceeded until ultimately the last time she was called the third time she was actually called to the stand at that time, she was, uh, found by the judge to be a competent witness. We take issue with the fact that basically the, uh, questions that were put to her, and we have them outlined in our brief, but they basically boil down to question of asking her, her first name, asking her, I believe it was her, uh, age. And then the other one was whether or not she would tell him the truth. And he defined the truth, uh, that means what really happened. Uh, and the fourth, uh, the child said, uh, excuse me, the judge said to the child, uh, the lie is when you don't tell or tell what did not happen. So they, and then the child nodded her head up and down. She then described various acts. We don't believe that this minuscule determination by the court, the child basically didn't say anything. The state provides in their, their brief. First of all, I mean, they take issue with your statement of facts, but then they, they, they further, uh, uh, they provide a lot more detail in terms of the questioning that the child went through than, than what your brief does. Um, and then they provide a lot of case law that suggests what the trial court did in this case is, is acceptable. Um, so first of all, what is our standard review in this case in regard to the court's decision, uh, to admit that child is competent? Well, and I think these, the state did state in there as they did find the, the proper standard in this instance, I believe that they had argued, or excuse me, they had taken issue with us that the standard of review that we had cited was a civil review. And so I apologize for that, but they said basically that the, uh, as I recall, the proper standard would be that the, uh, uh, a clear abuse of discretion. Uh, I think in this instance, the questions that basically were put were just that, or the finding that she was competent was just that we think that it was, you know, the child basically is viewed by us. Finally guess is right after the third time of going through these questions, you know, so, uh, can we just keep calling a witness until that witness is found to be competent and guess is the right answer. So yes, uh, we did cite the, uh, wrong originally, but after the child was found competent, then she described, uh, various acts. Then, uh, as we said, we didn't think that the child's testimony, and we did note in the child's, uh, we believe that in this instance, because of this timeline, one of the expert witnesses, or excuse me, the expert witness said that if the abuse had happened on that weekend, which was the 29th, 30th, and 30, 29th, 30th, I believe 31st, then it would not be, that was the time that the child was with the defendant the previous weekend, that it would not appear on June the 3rd, leading the information that it would have been someone other than, Mr. Harris that would have committed the abuse. So, uh, we think that it would have been important to actually have the pen to stay down if it was possible, but no effort was made to do that. Apparently, their defense was based upon the fact that the child had said, at least as presented by the defendant's wife when she first reviewed or interviewed the child, was that the abuse had happened prior to her coming on the morning of the 3rd, and defendant did not have any access to his child on June 1st, 2nd, and he was at work on the 3rd when the child came. In essence, that's what the state was seeking to prove, excuse me, the defense was trying to use as a defense, and they did not file for a bill of particulars, they did not take steps which we believe would have limited the testimony and would have made it more difficult for the state just to put on what they did, that entirely taking the light off the paramour, which is what we say, at least in the testimony originally from Mrs. Harris, the wife, that the child identified the paramour as the person who had touched her and caused the problems. Okay, I see your time is up, you'll have time for rebuttal, but before we move on, Justice McCanney, Justice Vaughn, any questions at this point? No questions. I have one briefly. Mr. Green, this court, the 5th district, the 1993 case, People v. Dempsey, talked about competency of a witness, and Dempsey said, an imperfect response to a question will not invalidate a finding of competency in light of what is indicated by the totality of the responses, and then went on to say, similar to here, I would say, while we think a more in-depth hearing of the witness' competency in the incident case may have been desirable, we do not think the deficiencies in the victim's testimony are sufficient to substitute our judgment for that of the trial judge who observed the witness. So the trial judge observing not only the questions and answers, but the demeanor and that sort of thing, why should we depart from the finding of Dempsey in this case here? What's different in this case than in Dempsey? Well, Judge, I believe the totality of circumstances was basically that the child had refused to answer the questions, and it shows that the child basically guessed right and raised her head up and down. On the issue, I mean, the child did speak to the judge, but that was after he had made his determination she was competent. Prior to that time, she told him no on two prior occasions, and the third time she said yes. So he basically, from our reading, it's not a taking away from the decision that's already been made by you, but the decision that the judge, the totality of circumstances, were just the opposite of what he found. Thank you. No other questions. Thank you. Okay, Mr. Green, as I said, you'll have time in rebuttal. Mr. Rodriguez, if you're prepared to begin, you may do so. Thank you, Your Honors. Good morning and may it please the Court. The trial court did not abuse its discretion in finding O.H. competent to testify. In this case, under the law, O.H. was presumed competent to testify, and as the Court's already recognized, defendant initially forfeited this issue by failing to challenge O.H.'s competency before the trial court. To the extent that the trial court may have had questions regarding O.H.'s availability, or perhaps there was questions regarding internal conflicts with regards to her testimony, it's clear from the record that the trial court found that O.H. was competent to testify, and there was no question asked to that issue. Thus, defendant's argument was failed in this regard. To start, pursuant to 725 ILCS 5-115-14, all witnesses regardless of age are presumed competent to testify, and a potential basis to disqualify the witness, there's only two under the statute. One, that the witness is incapable of expressing themselves concerning the matter, either directly or through interpretation, or what's at issue in this case is whether they were incapable of understanding the duty of a witness to tell the truth. The burden of proving this is on the defendant, and based on defendant's briefs and arguments, the people would assert the defendant has failed to satisfy this burden, which as the Court recognizes, the defendant recognizes, is analyzed under an abuse of discretion standard. Notwithstanding the forfeiture, the trial court did not abuse its discretion, as the record shows that O.H. was competent. O.H. consistently testified on February 9th and February 10th of 2021, that she knew what the truth was, she knew what it meant to tell the truth, and that she understood her duty to testify truthfully, and that's identified at 336 and 546 of the record. How many times did she answer that question differently? So, just to clarify kind of the the time frame, on February 8th of 2021, there was a problem with the audio. Initially, O.H. was going to testify via a closed circuit system, so she was passed on that day. On February 9th, she was recalled, and at that point, the trial court asked her if she would testify truthfully. She said yes, then there were subsequent statements made where she indicated or it appeared that she was uncomfortable or stated that when the judge asked her, do you understand what it means to lie, she should have no, and then she refused to answer any questions whatsoever. She would just nod her head or ask for her mother. So, at that point, the court asked the parties what they wanted to do, and ultimately, the trial court determined that it would pass the case one more time to the 10th to see if O.H. would testify. Then, as the people identifying the brief on the 10th is where the trial court explicitly asked her whether she understands her age and if she's going to tell the truth, the trial court then provides that very clear definition of the difference between a truth and a lie. The trial court found that to be sufficient. Therefore, based on the totality of the circumstances, both on February 9th as well as 10th, the people would assert that that was sufficient to find her competent to testify. Well, based on the fact that she was given several days in which to become comfortable in answering these questions to the court's satisfaction, doesn't it allude to the fact that she had been coached during those days after not answering correctly to get to a point three days later where she's able to answer those questions? I don't believe so, Your Honor. There's nothing in the record that would indicate any coaching. There was an attempt or a statement regarding, she was asked by her mother during her, O.H. was asked on cross if she had spoken about this, about testifying. She did indicate she subsequently recalled and testified that the extent of her conversation was telling O.H. that she needed to just testify and tell the truth. If she would and she was a good girl, your mother would take her to a store to buy a toy. I don't find that that would constitute any sort of coaching, nor did the trial court make any finding in regards to that. I don't think that argument will hold water, especially given this court's prior language and dempsey. If there's any contradictions or any conflicts regarding her testimony, that would at most go to her credibility and not her inherent competency to testify. I'd like to move on to the second issue, which is defendant's claim of ineffective assistance of counsel. The defendant did not suffer ineffective assistance of counsel due to trial counsel's failure to file a pre-trial motion for sanctions or failure to file a motion for bill of particulars that constitutes deficient performance. That choice to proceed or not proceed on pre-trial motions was a strategic choice, excuse me, within the purview of trial strategy of counsel and thus cannot support a claim of ineffective assistance. Furthermore, defendant fails to satisfy prejudice. In regards to the late discovery claim, defense counsel's decision, excuse me, not to file a pre-trial motion for sanctions was not sufficient because it was consistent with trial counsel's strategy to hold the state's feet to the fire and to proceed with the trial in the time frame defendant's speedy trial command. Therefore, it would have been counterintuitive to defense counsel's strategy to delay furthermore and to have a hearing on a motion for sanctions with dueling filings. Furthermore, in regards to defendant's argument that there's a perception that a discovery sanction would have meant exclusion of evidence is inconsistent with this court's recognition of the purpose of discovery. As this court stated in People v. Talley, the purpose of discovery is to prevent unfair surprise or advantage and to aid in the search of truth. This court has said in People v. Hawkins that it disfavors excluding evidence as a sanction for discovery violation since it's inconsistent with that goal of truth-seeking. Therefore, the preferred sanction in this case is exactly what the trial court gave defendant, which was it offered a recess or a continuance and the defendant explicitly rejected it. And you can see that rejection of 188 and 189 of the record. The trial court intimated that if any party did ask for a continuance, it would certainly entertain it. Based on the context, it seems like the court was going to be very liberal in granting that and defendant explicitly said no, they were ready for trial. That's evidence of counsel's strategic choice to proceed. Therefore, that failure to file the motion for sanctions cannot sustain the argument as ineffective assistance. I would argue, Your Honors, that the same analysis applies to defendant's claim regarding failure to file a motion for bill of particulars. Under Strickland, it can only be concluded that counsel's conduct was objectively unreasonable in not filing a trial motion if there was a likelihood that the defendant would have been successful in that claim. That's what the fourth district stated in People v. Henney. If it would have not prevailed, the defendant wouldn't prevail on that motion, then there's no error by not filing it. And the people would assert the defendant would have failed in that motion as well. He would have failed because the law does not dictate that the date of offense is an essential element in sex crime cases. That's what this court said in Inouye Jonathan T., and that's been mirrored by the fourth, third, and second districts in People v. Burton, and People v. Miller, and People v. Hickox. Furthermore, under Section 111-3A4 of the Criminal Code, it does not require the state to provide the precise date on which the offense occurred, but rather give some indication as definitely as can be done. The charging instrument in this case outlined the specific dates where the offense was alleged to have occurred with specificity. The acts were alleged in a very straightforward manner, and the time frame was sufficiently specific for the defendant to crack the defense and know which time frame they were speaking of. I would also argue or note that during trial testimony regarding the date, defendant's wife identified that the victim was with them during that time frame. That was also consistent with Ms. Bartain's testimony regarding the parental agreement and the time frames in which O.H. would be at her father's home, at the defendant's home, on what weekends and what dates, and what time she would be at home with her mother. In addition, a defendant, again regarding this Bill of Particulars claim, cannot establish prejudice under Strickland. Again, defendant merely fails to explain how he would have prevailed. He just asserts that the granting of this hypothetical motion may have in some way narrowed information or provided some clarity, but a possibility is not a reasonable probability under Strickland. Therefore, defendant's argument alleging ineffective assistance of counsel must also fail. I'd lastly like to discuss defendant's third claim regarding the sufficiency of the evidence. The evidence in this case established defendant's guilt for predatory criminal sexual assault of a child beyond a reasonable doubt. In this case, O.H. credibly testified that defendant placed his finger in her vagina. O.H.'s testimony was corroborated by the medical testimony and evidence, as well as the evidence derived from her CAC interview. Thus, the evidence established beyond a reasonable doubt that defendant was guilty of this crime. Such an argument is inconsistent with the standard by which this court assesses the sufficiency of the evidence in the light most favorable to the prosecution. Based on the totality of the evidence, a rational trier effect could have found that defendant was guilty and that the people had proved the essential elements of the crime beyond a reasonable doubt. As argued, O.H. credibly testified at 5.50 and 5.53 of the record, defendant placed his finger in her vagina, that she suffered vaginal bleeding as a result of that, and that, quote, daddy hurt me more than one time. Her testimony was consistent with her disclosures during the CAC interview, in which she identified defendant slash daddy as her sexual abuser. Ms. Hankins, the forensic interviewer who conducted that interview, credibly testified that she conducted a child-led interview, which is supported by the video evidence. The medical evidence further supports the finding that O.H. was sexually abused. The nurse practitioner at the ER, Ms. Shearbaum, testified about her treatment of O.H. on June 3rd of 2020, and she revealed that O.H. was complaining of pelvic pain and bleeding, which was not explained away by the diagnosis of a UTI. Dr. Swafford, the people's expert witness in child abuse pediatrics, testified that it was her opinion that O.H. had likely been a victim of sexual abuse, and she based that on a number of factors. The abnormality of a report of vaginal bleeding for a child of such a young age as O.H., which is at 4.68 in the record. O.H.'s extreme reaction to having her vaginal area examined, which is at 4.72 and 4.73 in the record. The lack of any prior history of a UTI, that's at 4.73 as well. The disconnect between the result of zero to five red blood cells identified in O.H.'s urinalysis as supporting the conclusion that a UTI was the cause of her vaginal bleeding, that's at 4.74 in the record. Dr. Swafford also relied on the fact that if O.H. had enough blood in her urine resulting from a UTI, then the bleeding would not have been gone by the time she arrived at the ER. And finally, the lack of any other medical symptoms or conditions which could explain O.H.'s vaginal bleeding as not being the result of a sexual trauma. Let me stop there for a second. There's no evidence anywhere, for many doctors or anyone else, other than the defendant's wife, that there was any blood in the vaginal area of this child, right? And if I'm correct on that, part of that, I'm sure your answer will be that the child wouldn't allow them to examine her thoroughly, but the one doctor or physician's assistant who had consistently seen this child since before she was born was able to do a full exam. And her exam didn't indicate any kind of bleeding or tearing or any type of trauma. Is that correct? That's correct, Your Honor. So in regards to the absence of blood, it was testified that the defendant's wife gave the victim a bath for two hours after having discovered this blood in her vaginal area. So I think in regards to why there was an absence of blood, that can be explained by that testimony, since it seems to have been... Okay, but let's stop. But if there's no blood in, you know, if she's given a bath and that correct, you know, eliminates any blood that was present at that time, assuming that, you know, there's a tear or some kind of trauma that caused the bleeding other than the possible UTI, there'd be some evidence of trauma to indicate where that blood, that one and only time that anyone saw blood, where it came from. I'm sorry, Your Honor. Please. Oh, no, no. Go ahead. In regards to that, the state's expert witness, Dr. Swofford, testified that it wouldn't have been strange that there wouldn't have been any physical evidence given the rapid healing nature of the tract. She testified that within 48 to 72 hours, there wouldn't have been any indication whatsoever. So it's not inconsistent with the facts that at the subsequent follow-up with OH's primary care physician, that she didn't identify any information. It's reasonably explained by the very nature of the body, why there wasn't any information or excuse me, any identification of a tear or any sort of source of bleeding so many days following, which again, as the people argued, is kind of compounded more by the fact that following the identification of this, the defense testified that she gave her a bath. So to the extent that there may have been any bleeding that would have been identified on that specific day, it's reasonable to infer that any evidence of that was washed away during the course of the bath. But she was examined within 48 hours of, within 24 hours of that initial discovery of blood, right? By the stepmom? Yes, Your Honor. So I believe a couple hours after this sort of initial fact was learned, the mother took OH to the Harrisburg ER, at which point there was an examination. I would note for the record that it wasn't a complete examination because when Ms. Shearbaum, the nurse practitioner, attempted to examine OH's vaginal area, she became incredibly uncomfortable. I think there's testimony in the record that she began to resist any further examination of her genital area. And so it was ultimately decided to move on and not proceed with that any further. Is that when there were three people trying to hold this three-year-old or four-year-old down? Yes, Your Honor. Yes, Your Honor. Okay. That's somewhat of a traumatic event in and of itself, isn't it? I certainly would agree, Your Honor, especially regarding the fact that this was a compounding of what was likely already a prior suffering of sexual abuse. So it most certainly wasn't something that I think is consistent with past practices. So what we, I mean, here's the problem having with the state's case on this, okay? I don't see any physical evidence of sexual abuse yet. We've got a lot of speculation. We've got a lot of speculation. If she's having pain, if she's having bleeding, if she's having, you know, she's resistant to allow people to examine her. Of course, the latter could be attributed to the fact that she had three people trying to hold her down when attempting to examine her. So we have that. If we establish, if we can get past that and establish that there was some sort of sexual abuse, I mean, if we find that the court was wrong in allowing the child to testify because she was incompetent, even though the court found her to be competent to testify, if we remove her testimony, do we have any evidence whatsoever that this defendant, again, assuming we find that there was some sort of sexual assault committed on her, do we have any evidence whatsoever to support that it was the father outside of the little girl's testimony? So I believe O.H.'s testimony does very clearly and directly identify the defendant. No, I know that, but I'm saying if O.H.'s testimony is found to have been impermissibly allowed, if we find that she should not have been allowed to testify, is there any evidence to suggest that someone else or that the father did this, committed this act? I don't believe there is, Judge. I think there was only ever an indication or there had been an attempt by the defendant to frame this in such a way that the mother's boyfriend, Mr. Travis, that may have been involved. Initially, Mrs. Harris testified, the defendant's wife, that the victim stated initially during the bath time that it was Cody, Mr. Travis, that did this. She subsequently contradicted herself during her direct testimony, both in the state's case as well as when she was called by the defendant. I recall that in the briefs as far as how she contradicted herself. So I mean, so once again, I mean, okay, it may not have been Cody and it may not have been the defendant, but I don't know that we have any competent testimony or evidence to so that's, that's, you know, not predisposing myself to how I'm falling on this, but that is of concern to me. Absolutely, Your Honor. And to the extent that I think there is also an indication in the record, even before Ms. Shearbaum did testify that the complaint that was received in the ER was that OH was complaining of pelvic pain and bleeding. So separate from the before any discussions that occurred that she was complaining of pelvic bleeding in her area, which is more consistent with the state's case or is consistent with the state's case and the subsequent evidence identified throughout the course of the trial. Okay. If you'd like to summarize, I know I've taken up the end of your argument time. If you'd like to summarize real quickly, you may do so. Yes, Your Honor. Defendant raises several arguments in his brief regarding the sufficiency of the evidence. Essentially, there are rehashing of credibility and competency issues, which I think we've already discussed, which the court is pretty clear on. I would find and just argue in closing that the evidence in its totality supported the conclusion that OH had suffered a sexual assault. All the testimony regarding the interview, the medical evidence is supportive of that. And the defendant's arguments to the contrary were contradicted by the video as well as his own sort of refusal to even acknowledge anything regarding anything to do with his daughter's vaginal area, which I think raises or at least an inference of consciences of guilt. But in the totality of the evidence, the people believe that it was sufficient to find the defendant guilty of a predatory criminal sexual assault of a child. Therefore, for the reasons we've argued today, as well as in our brief, we ask you to affirm defendant's conviction in the sentence. Thank you very much for your argument. Justice McKinney, Justice Vaughn, any questions for Mr. Rodriguez? No questions. Yes, I have a question. If following up on Justice Barbera's questions, if we find that the court properly found the victim competent, so her testimony is disallowed, there was a hearing to allow out-of-court statements. Does the finding that she was not competent, does that also throughout the 115-10 hearing statements that Not at all, Your Honor. A 115-10 hearing, as the court knows, is a separate hearing outside of the jury in which the trial court has to make specific factual findings that the time, place, and circumstances of the disclosure provided sufficient safeguards for liability. Based on the video evidence, as well as the testimony of Ms. Hinkins, the forensic interviewer, the trial court made those specific findings and found that it was credible. So I don't believe if the court did exclude the live testimony, the 115-10 hearing statements and the evidence that derives from that would be sufficient as well. Thank you. Thank you. Okay. Thank you, Mr. Rodriguez. Mr. Green, you have time to rebuttal. Thank you. Yes, that's one of the the, in this instance, the expert witness that they had called, Dr. Kathy Swofford, her determination was that it was likely that the child had been abused or that what she said would be consistent with a claim of abuse. She made no actual finding that there was, in fact, abuse of this child. Now, another issue is raised is what forensic evidence was there? The state had in its possession the washcloth, which had been used by the defendant's wife when she gave the child a bath. Those were turned over by them to the state. Nothing was ever done. Nothing was ever examined on what was done with those, what substance, if any, was on those washcloths. Now, I mentioned Dr. Kathy Swofford's determination and the factual issue of evidence of her, the child being abused. As you recall, the child was not at her dad's on the 1st of June, the 2nd of June, and on the 3rd of June, she was brought at 8 o'clock or thereabout by her maternal, I think it was her paternal grandparents, excuse me, picked her up at McDonald's and brought her. The defendant was at work and his wife, Kelsey, was home. Now, it was during this afternoon of this day when Kelsey saw what she thought was something wrong with the child's vaginal area. Now, Dr. Swofford had testified that if, in fact, there was trauma that led to bleeding, and it occurred the weekend before, on the 29th or 30th or 31st, it was unlikely... Which would have been when the defendant had access to the child, correct? It would have been his last access to the child. That it would have been still there on the 3rd of June. So, by their own expert says that it's unlikely that the abuse would have occurred at the last time when the child was in his custody, excuse me. So, that's one of the issues having to do with their expert. Dr. Swofford, the expert, also had testified that if she had received any information that was in error, it may make her determinations in error. Now, the woman that conducted, I believe, the interview, the CAC talked about some errors that had been made. There had been some factual errors or something about who the original report was on, whether it was on Cody or whether it was on the defendant. Anyway, so the doctor acknowledged that if there were errors, that her diagnosis, which was her diagnosis, that it was likely, not beyond a reasonable doubt, that the child had been abused. We think also the other issue, whether or not the child had been coached. Well, the state says that she said that she had to her mom about, or the mom had talked to her about talking to the man in the black gown being the judge. Well, the child originally said the question put by the defense at that time was, did mom tell you what to say? And the child said yes. And it was only on re-examination by attorneys for the state that it came out that it had to do with something else. So, we think there was more than likely an opportunity for coaching. The mother testified she hadn't talked to her child about it for all this period of time, but that's strange credibility. Nonetheless, we believe that had his attorneys had in their hands this doctor's report prior than 24 hours of the workday before trial on Monday, or had had it when the state had gotten it months before, if they'd had it in their hands, they could have maybe done something else. They should have filed for at least a set of sanctions to determine what, if anything, the judge would do in this instance. They didn't have it in time, in my opinion, for what that's worth. Nonetheless, we think, in this case, my client has been convicted. A Kafkaesque situation, if you will. The child was in his custody on a Sunday at 6 p.m. Two days go by, and then it's on the third day when he's already at work, so he had no access to the child after the Sunday at 6 p.m. The state's find so important being this redness that they did not test, even though it was in their possession as it had been recovered from Kelsey. My client has an instance where, according to Kelsey, the child had said that he, meaning it had happened before the child came on Wednesday, so she took the opinion that it was Cody, but the child said that it happened before she came on that day, or worse to that effect. So my man is in the position, he's at work, his wife says your child has redness. Mr. Green, your time is up, and I do have one question for you, though. Was the defendant, his past criminal history, does he have a past criminal history prior to this charge that was brought up at trial? No, I do not think that it was, your honor. He had a case pending before the before this one, but it was pending. It had not been determined, so. A criminal case? Yes, sir. Okay, but that was not on the record in this case? I don't believe it was brought up on the record, and I do not know of the trial judge. I'm assuming he was aware of it, because that case tracked with all the others, but as far as anything on the record, no, sir. Okay, all right. Justice McCanney, Justice Vaughn, any questions for Mr. Green? No questions, no other questions. Okay, thank you. Mr. Green, Mr. Rodriguez, thank you both for your arguments today. The court will take the matter under consideration and issue its ruling in due course.